IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



FILED
OCT 2 4 2008
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

SHARONE WYATT-BURNETT,

    Plaintiff,

v.    Civil Action No.: 3:08CV689

SELECTIVE INSURANCE COMPANY OF AMERICA,

    Defendant.

JURY TRIAL
DEMANDED

## COMPLAINT

The plaintiff Sharone Wyatt-Burnett ("Ms. Burnett"), by counsel, and for her Complaint against the defendant Selective Insurance Company of America ("Selective"), represents unto the Court as follows:

### INTRODUCTION

Ms. Burnett brings this civil action against her former employer alleging race discrimination in the terms and conditions of her employment, and retaliatory discharge on account of her complaining of such race discrimination, both in violation of her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2 and 3; and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

### THE PARTIES

1. The plaintiff Ms. Burnett is an African-American female residing at 6360 Springcrest Lane, Richmond, Virginia 23231.

2. The defendant Selective is believe to be a corporation duly organized in one of the United States. Selective is engaged in provision of insurance products. It has its headquarters at 40 Wantage Avenue Branchville, NJ 07890. At all times during the events complained of herein, Selective was believed to have over 2000 employees, and is thus "employer" as understood in 42 U.S.C. § 2000e-2(b), and a "respondent" as understood under 42 U.S.C. § 1981a(b)(4).

## JURISDICTION AND VENUE

3. 1. Jurisdiction over plaintiff's claims is based on 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343(a)(3) (violation of civil rights), and 42 U.S.C. § 2000e-5(f)(3) (violation of Title VII). Venue is proper in this District, as the location of the parties and the situs of the events complained of here.

## ALLEGATIONS COMMON TO ALL COUNTS

4. Ms. Burnett was hired on or about May 8, 2006 as an assistant account executive Selective Insurance Company of America, specifically the Selective Service Center in Richmond, Virginia. Ms. Burnett was hired by Ms. Deborah Dinsdale, the manager of her department. Her direct report was Ms. Lisa Eckert, her team leader. Ms. Burnett was hired at an initial salary of $29,500.

5. It became apparent that Ms. Burnett was being subjected to race discrimination from the outset of her employment. While Ms. Burnett had obtained previous account executive experience, she was hired as an assistant account executive, with lower pay and reduced opportunity for performance-based bonuses and incentives. Just two weeks after being hired, a white male, Rodney Paulus, was hired as an account

2

executive despite the fact that he had no prior experience in that position. During the course of his employment, it is reported that Mr. Paulus experienced difficulty performing at the level of an account executive.

6. In July of 2007, Ms. Burnett inquired about her qualifications for a vacant account executive position. By this time, Ms. Burnett had been with Selective for more than one year, and had already begun functioning as an account executive. She also obtained her associate in underwriting and insurance services designation from the American Institute of Insurance, and the applicable insurance licenses. In addition, up until this time, Ms. Burnett had received positive performance evaluations and merit pay increases.

7. Nevertheless, Ms. Burnett was passed over for the account executive position in favor of a white female named Shannon Gibbons, who had none of the foregoing experience, degrees, designations or licenses. These items were posted as prerequisites for the position. Following her hire, Ms. Gibbons left the Selective Service Center after some period of time because she was unable to pass the insurance licensure examination.

8. On or about October 4, 2007, Ms. Burnett had a meeting with Ms. Eckert to discuss Ms. Burnett's performance and meeting of team goals. Ms, Eckert asked Ms. Burnett if she believed that she was being treated fairly, whereupon Ms. Burnett expressed that she believed that she was more qualified than Ms. Gibbons for the recently filled account executive position. Ms. Burnett explicitly stated that she believed that race was a motivating factor in the decision to hire Ms. Gibbons over her.

9. Ms. Burnett also expressed that the hiring of Mr. Paulus as an account executive without prior experience was similarly an indication that the Selective Service

3

Center illegally considered applicant's race in the making of hiring decisions. In addition, Ms. Burnett also identified past instances of racially-motivated conduct, such as pointing out the fact that the former regional manager of Selective was black (James McLain), suggesting that Ms. Burnett should speak with the only other black employee about her problems, and an office outing to a minor league baseball game in which all of the white employees and their family members sat in one section and the few black employees and family members were relegated to a different section. In all, the meeting described herein was emotional for Ms. Burnett, as she has not in the past been subjected to, or made accusations of, race discrimination in the workplace.

10. In the aftermath of the aforementioned meeting with Ms. Eckert, Ms. Burnett's performance came under intense and unfair scrutiny. For instance, beginning on October 19, 2007, Ms. Burnett began receiving e-mails criticizing her for supposedly not following company procedures. On October 30, 2007, she received an e-mail message suggesting that she did not properly handle a customer calling with a complaint. She also received low customer service quality scores, which dropped from 95 the year before to 86 in November of 2007.

11. On or about November 1, 2007, Ms. Burnett had a meeting with Ms. Eckert and human resources representative Amy Sohosky. The latter warned Ms. Burnett that future poor performance would be met with disciplinary action. On November 13, 2007, following another criticism that Ms. Burnett deemed to be unfounded, she called Ms. Sohosky to discuss the matter. Ms. Burnett explained that the sudden rash of criticisms, following what had been to that time positive job performance evaluations and general praise, were generated in an effort to discredit her and in retribution for her prior complaints of discrimination and unfair treatment.

12. On November 19, 2007, Ms. Eckert advised Ms. Burnett by e-mail that the Selective work environment did not appear to be suited to her temperament, considering the restrictive and structured environment of the office.

13. On December 13, 2007, Ms. Burnett spoke by telephone with Ms. Sohosky and Kimberly Burnett, another human resources representative. The latter advised Ms. Burnett to initiate a performance plan and to subject herself to more scrutiny.

14. On December 14, 2007, Ms. Eckert forwarded to Ms. Burnett an e-mail from Carolyn Opalka stating that Ms. Burnett was not at her desk and informing Ms. Eckert of her whereabouts. Ms. Opalka subsequently sent a second e-mail stating that Ms. Burnett was "on her last nerve." The e-mails ignored the facts that Ms. Burnett was scheduled to be out of the office from 11:20 a.m. to 1:30 p.m., and was thereafter scheduled to meet with human resources in the afternoon.

15. On December 21 and 28, 2007, Ms. Burnett was accused of mishandling customer complaints and of being rude. These incidents subsequently became the subject of complaints against Ms. Burnett's performance. Ms. Burnett denied having been rude to either customer, and objected to the lack of any documentation to support the complaints.

16. On December 28, 2007, Ms. Eckert again suggested that Selective might not be a suitable work environment for Ms. Burnett. On January 2, 2008, Ms. Eckert charged Ms. Burnett with being undependable and irresponsible regarding her attendance, and that problems with her attendance and record keeping would be negatively reflected in her year-end review. The attendance records, however, did not reflect any deficiencies in Ms. Burnett's attendance. That same day, Ms. Eckert informed Ms. Burnett that she was utilizing the wrong code for her attendance. Ms. Burnett

5

inquired of the IT department whether this was true, and it was determined that Ms. Burnett was using the correct code.

17. On January 8, 2008, Ms. Burnett was called into a meeting to discuss customer complaints. She questioned the validity of the complaints. Nonetheless, Ms. Burnett was put issued a performance warning. Following the meeting, Ms. Eckert told Ms. Burnett that since she had "brought attention" to herself, things in the office would "get harder" for her.

18. On January 15, 2008, Ms. Eckert sent an email message to Ms. Burnett stating that referring to female customers as "Miss," following by their first names, was improper and considered offensive by customers. Ms. Eckert stated that using that sort of formality was what "slaves were made to call their masters," and what "children call their caregivers." Ms. Burnett replied that comparing herself to slaves was offensive and inappropriate.

19. Upon information and belief, Ms. Eckert had the deliberate intention of inciting Ms. Burnett to outrage, especially given Ms. Burnett's race and her assertions that Selective was practicing discrimination in its hiring decisions.

20. On January 17, 2008, Ms. Eckert informed Ms. Burnett that she had been placed on a verbal warning for an attendance issue that she had previously stated was not improper. Ms. Eckert further informed Ms. Burnett that "this is what happens when you get HR involved." On January 22, 2008, Ms. Eckert advised Ms. Burnett that because of the verbal warning, her behavior would be closely monitored.

21. Over the course of February 5 and 6, 2008, Ms. Burnett was informed that she had not attained her "cross-sell" goal. Ms. Burnett noted, however, that Ms. Eckert

had not shown her the final report that would have afforded her an opportunity to achieve the goal, Ms. Eckert had routinely done for other (white) employees.

22. On February 8, 2008, Ms. Burnett received her annual review, in which she was rated below standard. This made Ms. Burnett ineligible for a raise or bonus. The review was given in the presence of Ms. Sohosky, which was a deviation from normal Selective practice. Ms. Burnett was told to sign the review, which she refused to do, stating that she did not agree with it. Ms. Sohosky replied that "just because you sign it doesn't mean that you agree with it." Ms. Burnett insisted on being able to submit a written memorandum rebutting the annual review, but was denied this request. Ms. Eckert then told Ms. Burnett by "pursuing the matter," Ms. Burnett was somehow indicating that Ms. Eckert was not doing her job, when in fact Ms. Burnett was responsible for her own job performance.

23. On February 14, 2008, following a series of back and forth e-mails regarding Ms. Burnett's right to submit a written rebuttal of her annual review, Ms. Sohosky informed Ms. Burnett that if she got emotional as she did at the February 8th meeting, it would be deemed unprofessional and constitute grounds for termination. Ms. Burnett relied that Mss. Eckert and Sohosky's threat of termination was intended to discourage her from submitting a written rebuttal setting forth her version of the facts that resulted her receiving an unfairly critical annual review.

24. On February 19, 2008, Ms. Burnett was summonsed to a meeting with Mss. Eckert and Sohosky and Craig Borens. She was notified that her employment was terminated immediately, due to the fact that they did "not think we can get past all this." When Ms. Burnett attempted to response, she was curtly cut short by Ms. Sohosky that the decision had been made and that no further explanation would be offered.

25. Upon information and belief, Selective denied Ms. Burnett promotion to a position for which she was imminently qualified on account of her African American race.

26. Upon further information and belief, Mss. Eckert, Ms. Sohosky and others in the Selective Service Center in Richmond engaged in a pattern of intimidating and harassing behaviors in an effort to persuade Ms. Burnett to voluntarily abandon her employment in order to escape the false and unfair complaints and criticisms of her job performance. These behaviors were undertaking solely in response to Ms. Burnett's accusations that she had been the subject of race discrimination in the terms and conditions of her employment.

27. On or about February 22, 2008, Ms. Burnett filed a timely Charge of Discrimination against Selective with the U.S. Equal Employment Opportunity Commission ("EEOC") that asserted race discrimination and retaliation (Charge No. 438-2008-00616). The EEOC issued Ms. Burnett a Notice of Right to Sue (Issued on Request) dated September 30, 2008.

<u>COUNT I</u>
ACTION FOR RACE DISCRIMINATION UNDER TITLE VII
OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-2

28. By denying Ms. Burnett a promotion for which she was more qualified than the white individual to whom it was offered, and by dismissing her from employment on account of bias against her African American race, as described herein, defendant Selective, violated the anti-discrimination provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2.

29. Ms. Burnett's injuries under this Count entitle her to an award for (a) loss of past and future earnings, including fringe benefits; (b) humiliation, pain and suffering, emotional distress, and loss of personal and professional reputation; (c) injury to her future career; (d) attorney's fees under 42 U.S.C. § 1988; and (f) costs of suit.

### COUNT II
### ACTION FOR RACE DISCRIMINATION UNDER
### THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 2000e-2

30. By denying Ms. Burnett a promotion for which she was more qualified than the white individual to whom it was offered, and by dismissing her from employment on account of bias against her African American race, as described herein, defendant Selective, violated the anti-discrimination provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

31. Ms. Burnett's injuries under this Count entitle her to an award for (a) loss of past and future earnings, including fringe benefits; (b) humiliation, pain and suffering, emotional distress, and loss of personal and professional reputation; (c) injury to her future career; (d) attorney's fees under 42 U.S.C. § 1988; and (f) costs of suit.

### COUNT III
### ACTION FOR RETALIATORY DISCHARGE UNDER TITLE VII
### OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e-3

32. By harassing Ms. Burnett and ultimately dismissing her from employment in retaliation for expressing her genuine belief that Selective was illegally making hiring and promotion decisions on account of race, and otherwise discrimination against her on account of her African American race, as described herein, defendant Selective,

violated the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3.

33. Ms. Burnett's injuries under this Count entitle her to an award for (a) loss of past and future earnings, including fringe benefits; (b) humiliation, pain and suffering, emotional distress, and loss of personal and professional reputation; (c) injury to her future career; (d) attorney's fees under 42 U.S.C. § 1988; and (f) costs of suit.

### COUNT IV
### ACTION FOR RETALIATORY DISCHARGE UNDER THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981

34. By harassing Ms. Burnett and ultimately dismissing her from employment in retaliation for expressing her genuine belief that Selective was illegally making hiring and promotion decisions on account of race, and otherwise discrimination against her on account of her African American race, as described herein, defendant Selective, violated the anti-retaliation provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

35. Ms. Burnett's injuries under this Count entitle her to an award for (a) loss of past and future earnings, including fringe benefits; (b) humiliation, pain and suffering, emotional distress, and loss of personal and professional reputation; (c) injury to her future career; (d) attorney's fees under 42 U.S.C. § 1988; and (f) costs of suit.

WHEREFORE, the plaintiff Sharone Wyatt-Burnett demands judgment against the defendant Selective Insurance Company of America in the amount of TEN MILLION DOLLARS ($10,000,000.00) in compensatory and punitive damages, attorney's fees and costs of suit, and such other and further relief as this Court may deem just and proper.

Respectfully submitted,

SHARONE WYATT-BURNETT

By: _____/s/ Crowley_____

Scott Gregory Crowley (VSB # 31216)
Crowley & Crowley
The Meridian Building
1800 Bayberry Court, Suite 102
Richmond, Virginia 23226
Phone: (804) 282-5303
Fax: (804) 282-5337
E-mail: cclawva@aol.com